# 11-4697-CV

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



D.D-S, individually and as parent and next friend
to B.D-S, a child with a disability,

*Plaintiff-Appellant,*

*v.*

SOUTHOLD UNION FREE SCHOOL DISTRICT,

*Defendant-Appellee.*

———————————

*On Appeal from the United States District Court
for the Eastern District of New York (Central Islip)*

## BRIEF FOR DEFENDANT-APPELLEE

Christopher F. Venator
INGERMAN SMITH, L.L.P.
*Attorneys for Defendant-Appellee*
150 Motor Parkway, Suite 400
Hauppauge, New York 11788
631-261-8834

# **TABLE OF CONTENTS**

PAGE

Table of Authorities ................................................................ ii

Preliminary Statement ............................................................1

Jurisdiction ...........................................................................2

Statement of the Issues..........................................................2

Statement of the Case............................................................3

Statement of Facts ................................................................5

Summary of Argument...........................................................17

Argument

    Point I

        STANDARD OF REVIEW ...............................................20

    Point II

        THE DISTRICT COURT CORRECTLY UPHELD
        THE DENIAL OF TUITION REIMBURSEMENT
        FOR THE 2008-09 SCHOOL YEAR AS THE
        UNILATERAL PLACEMENT AT LANDMARK
        WAS INAPPROPRIATE TO MEET
        B'S EDUCATIONAL NEEDS .........................................22

Conclusion ...........................................................................33

# TABLE OF AUTHORITIES

**Cases**

A.E. v. Westport Bd. Of Educ.,
463 F.Supp.2d 208 (D. Ct. 2006)...........................................................23

Ashland Sch. Dist. v. Parents of Student R.J.,
588 F.3d 1004 (9th Cir. 2009) ..............................................................25

Bd. of Educ. v. Rowley, 458 U.S. 176 (1982)..........................................4, 5, 20, 21

Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186 (2d Cir. 2005) ............................21

D.D-S v. Southold Union Free Sch. Dist., No. 09-CV–5026(JS),
2011 WL 3919040 (E.D.N.Y. Sept. 2, 2011) ......................................................1, 2

Dzugas-Smith v. Southold Union Free Sch. Dist.,
No. 08-CV–1319(SJF), 2012 WL 1655540 (E.D.N.Y. May 9, 2012) ...............7, 30

E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.,
742 F.Supp.2d 417 (S.D.N.Y. 2010) .....................................................18

Escambia County Bd. of Educ. v. Benton,
406 F.Supp.2d 1248 (S.D.Ala. 2005) ....................................................11

Florence County Sch. Dist. Four v. Carter by Carter,
510 U.S. 7 (1993)..........................................................................4, 17, 22

Forest Grove Sch. Dist. v. T.A., 557 U.S. 230 (2009)............................................23

Frank G. v. Bd. of Educ., 459 F.3d 356 (2d Cir. 2006)....................................18, 24

Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105
(2d Cir. 2007)............................................................................20, 21, 23

Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377
(2d Cir. 2003) .........................................................................19, 25

Jennifer D. v. N.Y. City Dep't of Educ.,
550 F. Supp.2d 420 (S.D.N.Y. 2008) ....................................................21

Kasenia R. v. Brookline Sch. Dist.,
588 F.Supp.2d 175 (D.NH 2008)............................................................25

M.S. v. Bd. of Edu. of the City of Yonkers,
231 F.3d 96 (2d Cir. 2000), cert. den. 532 U.S. 942,
121 S.Ct. 1403 (2001).........................................................17, 19, 23, 24

M.S. v. Fairfax County Sch. Bd., 553 F.3d 315 (4th Cir. 2009) ............................25

Mrs. B. v. Milford Bd. of Educ., 103 F.3d 114 (2d Cir. 1997) ...............................27

P v. Newington Bd. Of Ed., 546 F.3d 111 (2d Cir. 2008)........................................31

Pinn v. Harrison Cent. Sch. Dist.,
473 F.Supp.2d 477 (S.D.N.Y. 2007) ......................................................25

Rafferty v. Cranston Public Sch. Comm.,
315 F.3d 21 (1st Cir. 2002)...............................................................23, 24

Sch. Comm. of the Town of Burlington v. Dep't of Educ.,
Mass., 471 U.S. 359 (1985) ..........................................................4, 17, 22

Schreiber v. East Ramapo Central Sch. Dist.,
700 F.Supp.2d 529 (S.D.N.Y. 2010) .....................................................24

W.C. v. Cobb County Sch. Dist., 407 F.Supp.2d 1351
(N.D.Ga. 2005)..............................................................................25

W.S. ex rel. C.S. v. Rye City Sch. Dist.,
454 F.Supp.2d 134 (S.D.N.Y. 2006) ......................................................27

Walczak v. Fla. Union Free Sch. Dist.,
142 F.3d 119 (2d Cir. 1998)..............................................................20, 27

Weaver v. Millbrook Cent. Sch. Dist.,
812 F.Supp.2d 514 (S.D.N.Y. 2011) .........................................18, 19, 31

**Statutes**

20 U.S.C. § 1401(18) ...................................................................................4

20 U.S.C. § 1412(a)(5) ..............................................................19, 25, 26

20 U.S.C. § 1415(c)(2) ...........................................................................20

28 U.S.C. § 1291 .......................................................................................2

New York State Education Law Article 89 ......................................18, 23

**Regulations**

34 C.F.R. §§ 300.114(a)(2), 300.116...................................................24

8 NYCRR § 200.1(cc)......................................................................24, 26

**Administrative Decisions**

Application of a Child with a Disability, Appeal No. 07-119 .................30

Application of a Student with a Disability, Appeal No 08-151...............28

Application of a Student with a Disability, Appeal No. 09-018...........23, 28, 29, 30

Owen J. Roberts School District, 29 IDELR 742 (SEA Pa. 1998)........................30

## **Preliminary Statement**

Defendant-Appellee, Southold Union Free School District (hereinafter, "District"), submits this brief in opposition to the appeal of Plaintiff-Appellant D.D-S. (hereinafter, "Parent") from a judgment entered on September 9, 2011 in the United States District Court for the Eastern District of New York (hereinafter, "District Court") (JA 111).[1]  That judgment was based upon a September 2, 2011 Memorandum and Order, published at D.D-S v. Southold Union Free Sch. Dist., No. 09-CV–5026(JS), 2011 WL 3919040 (E.D.N.Y. Sept. 2, 2011), affirming the decision of the State Review Officer (hereinafter, "SRO"), denying Parent tuition reimbursement for the 2007-08 and 2008-09 school years and compensatory educational services for the summer 2008.  The SRO, in its decision dated October 8, 2009, affirmed the decision of an Impartial Hearing Officer (hereinafter, "IHO"), dated July 15, 2009, denying Parent's requested relief in its entirety (JA 36; 5).  The SRO properly dismissed Parent's appeal from the final determinations of the IHO.

Presently before this Court, Parent appeals only the denial of tuition reimbursement for the 2008-09 school year.  Parent requests that this Court reverse the judgment of the District Court which affirmed the decision of the SRO, denying tuition reimbursement for the 2008-09 school year on the grounds that

---

[1] Citations to the Joint Appendix are referred to herein as "JA__."

1

Brittany's (hereinafter, "B") unilateral placement by Parent at the Landmark School (hereinafter, "Landmark") was overly and unnecessarily restrictive.

Specifically, as related to this appeal, the administrative record evidences that Parent failed to establish that Landmark offered her daughter an appropriate program for the 2008-09 school year. For the reasons set forth below, the Court should deny Parent's appeal in all respects.

## Jurisdiction

This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 because the District Court issued a final order dated September 2, 2011 (JA 67; 2011 WL 3919040) and entered a final judgment on September 9, 2011 dismissing this action in its entirety (JA 111). On October 3, 2011, Parent filed a notice of appeal (JA 112).

## Statement of the Issues

1.    Did the District Court correctly determine that Parent was not entitled to tuition reimbursement for her unilateral placement of B at Landmark for the 2008-09 school year based on the fact that the placement was inappropriate because it was overly and unnecessarily restrictive to meet B's educational needs?

The District respectfully submits that the question should be answered in the affirmative.

2

## **Statement of the Case**

The District submits this brief in opposition to the appeal of the decision of United States District Judge Joanna Seybert, dated September 2, 2011, by Parent. In her decision, Judge Seybert upheld the decision of the State Review Officer Robert G. Bentley which sustained the decision rendered by the Impartial Hearing Officer James McKeever regarding Parent's request for tuition reimbursement arising from her unilateral placement of her daughter at Landmark for the 2007-08 and 2008-09 school years. As previously stated, the appeal before this Court only addresses the denial of tuition reimbursement for the 2008-09 school year. The administrative record will show that the District conceded that it did not offer B a free appropriate public education (hereinafter, "FAPE") for the 2008-09 school year based upon a procedural technicality. Therefore, this appeal addresses whether Parent's placement of B at Landmark for the 2008-09 school year was appropriate.

In his decision dated October 8, 2009, the SRO upheld the IHO's July 15, 2009 determination that Parent's unilateral placement of B at Landmark for the 2008-09 school year as not appropriate because it was overly restrictive.

The law is well settled that a board of education may be required to pay for educational services obtained for a child by the child's parents, if the services offered by the board of education were inadequate or inappropriate, the services

3

selected by the parents were appropriate, and equitable considerations support the parents' claim.  Sch. Comm. of the Town of Burlington v. Dep't of Educ., Mass., 471 U.S. 359 (1985); Florence County Sch. Dist. Four v. Carter by Carter, 510 U.S. 7 (1993).

The Supreme Court shed light on what appropriate services means in Rowley, the seminal case on this issue.  In that case the Court recognized that the Individual with Disabilities Education Act (hereinafter, "IDEA") defines "free appropriate public education" as

> special education and related services that (A) have been provided at public expense, under public supervision and direction and without charge, (B) meet the standards of the State Educational Agency, (C) include an appropriate pre-school, elementary and secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under § 1414(a)(5) of [this act].

20 U.S.C. § 1401(18).  The Court noted that "free appropriate public education" does not mean an education that maximizes a child's potential.  Bd. of Educ. v. Rowley, 458 U.S. 176, 189-190 (1982).  Specifically, it found that the IDEA lacked any provision requiring states to "maximize the potential of handicapped children commensurate with the opportunity provided to other children." Id.  States need not provide "every special service necessary to maximize each handicapped child's potential." Id. at 199.  Rather, the Court found that Congress intended that the IDEA open the door of public education to handicapped children, not guarantee

4

any particular level of services once inside.  Id. at 192.

The District respectfully submits that the District Court properly concluded that Landmark was not an appropriate placement for B for the 2008-09 school year so as to warrant tuition reimbursement for that school year.

## Statement of Facts

Although Parent appeals only the denial of tuition reimbursement for the 2008-09 school year the District proffers the foregoing facts pertinent to that school year along with prior school years to evidence that B's parental placement at Landmark for the 2008-09 school year was not appropriate thereby showing that the IHO, SRO and District Court all properly concluded that tuition reimbursement should be denied.

 At the time of the impartial hearing B was 14 years old and in the ninth grade at Landmark pursuant to her Parent's unilateral placement (Parent Ex. P-A; District Ex. 14).  Landmark is a Massachusetts private school that exclusively serves students with language-based learning disabilities.  The high school program, which B began attending in September 2007 as an eighth grader, is residential (See T. 860).

### Factual Background

As a result of her moderate weakness in working memory and language deficits, B is a student classified as learning disabled, and she was placed in

5

District programs throughout her academic career.

Parent unilaterally enrolled B into the Landmark School year program beginning in September 2006 for her 7th grade year, and filed a due process complaint seeking to have the District pay for B's attendance there. The IHO and SRO determined, and the District Court upheld, the District's recommended program for B's 7th grade year to be appropriate.

Among other things, the development of B's 7th grade program was based upon B's progress during her 6th grade year in the District. B's test grades were average during 6th grade (T. 230, 1200-1202, 1208, 1215-1216). She was fully able to follow along and participate in the general education environment with resource room support, and access the curriculum and make progress at a level on par with her typically developing peers (T. 223, 227, 230-231, 233, 242, 256). She was also skilled at advocating for herself and expressing her needs (T. 226-227). B took on a lead role that year in the annual school musical (T. 226). She was able to memorize her lines through a great deal of repetition, and "stole the show" (T. 232, 256-257, 279, 1181) B's 6th grade resource room teacher also found her able to access the 6th grade curriculum, as well as the texts, which were at a 6th grade level (T. 256). She was capable of writing essays, and had a good understanding of sentence structure and paragraphing (T. 255). In his view, "B was capable of functioning at the seventh grade level within Southold. ... [and that] she would

move on to become successful after her schooling, either high school or college (T. 258). Given B's progress and capabilities in 6th grade, her recommended 7th grade program appropriately called for her to be placed in District in a mainstream setting with resource room services 6 times in a 6-day cycle along with additional support services (District Ex. 4, pp. 1-2).

Notably, in addition to determining that the District's recommended 7th grade program was appropriate for her, the SRO also found Landmark's program was inappropriate in that it was overly restrictive to meet B's needs - which the District Court affirmed. Dzugas-Smith v. Southold Union Free Sch. Dist., No. 08-CV–1319(SJF), 2012 WL 1655540, 26 (E.D.N.Y. May 9, 2012).

### Evaluations

Although the District has not contested B's eligibility for special education services, her needs are minimal, as demonstrated by cognitive, educational, auditory, and speech/language evaluations.

B was evaluated by Landmark in the spring of 2007, and in August 2007 by neuropsychologist Herman Davidovicz and by audiologist/speech pathologist Donna Geffner (Parent Ex. B(5); District Ex. 12, 17, 18). The evaluation results clearly demonstrate that B's special education needs could easily be met in public school or, at least, in an educational setting less restrictive than an out-of-state residential placement.

Despite a diagnosis of Attention Deficit/Hyperactivity Disorder at the age of 8, Dr. Davidovicz found that B does <u>not</u> meet the criteria for that diagnosis (T. 1288). He found B to be task-oriented and focused, with summary scores from the Test of Variables of Attention being within normal limits (District Ex. 17, pp. 2-3). Although Dr. Davidovicz's written report suggested some executive functioning weaknesses, her overall scores on the Delis-Kaplan Executive Function System Color Word Interference Test and on the Tower Test were within the average range (District Ex. 17, pp. 8-9). B's full scale IQ measured 108, within the average range. B's Verbal Comprehension measured 116; her perceptual reasoning measured 115, both in the high average range. Her processing speed measured 109, and her working memory, an area of weakness in prior testing (District Ex. 1, p. 3), measured 77 (District Ex. 17, p. 8).

Dr. Davidovicz noted that B had no difficulty with speech articulation and that her language skills were well-developed (District Ex. 17, p. 4). Her vocabulary, speech morphology, syntax, and language understanding, in both semantic and inferential understanding, were all normal (<u>Id.</u>). Dr. Davidovicz also found significant improvements in B's auditory processing skills. Her phonemic awareness was within the average range on all administered testing (District Ex. 17, p. 5). On the SCAN-A, B's scores fell in the average range for filtered words and auditory figure ground, but was in the 1st percentile in competing words

8

(District Ex. 17, p. 5, 10), which Dr. Davidovicz attributed to inattention (T. 1279). Her working memory skills were noted to be poor, although some memory-related evaluation scores fell within the 25-75 percentile average band (District Ex. 17, p. 10).

B's performance on many academic tasks was superior, with few results below the average range. On the Woodcock Reading Mastery Test (Rev'd), she achieved 32% in Word Identification; 76% in Word Attack and 75% in Passage Comprehension. On the Gray Oral Reading Test, although her rate was slow (16%), her accuracy was 63%, fluency 37%, and comprehension 50% (District Ex. 17, p. 10). B's spelling was 48%, and her scores on the Test of Written Language were in the bright-normal range, with Contextual Conventions of 91%, Contextual Language of 95% and Story Construction of 95% (District Ex. 10, p. 10). Dr. Davidovicz described her writing as "quite sophisticated". B's performance in math was also good, with all scores in the average to above average range (District Ex. 17, p. 6, 10). In sum, Dr. Davidovicz found that B had no apparent residual difficulty in the areas of language understanding or production, except for word retrieval, and no behavior, adjustment, or personality issues, as assessed on the BASC-II (District Ex. 17, p. 6, 11). One of Dr. Davidovicz's recommendations was that B be worked with more closely recommend placing B in a special class setting or against placing her in a larger, more inclusive setting (District Ex. 17, p.

9

7; see T. 1295).  He did acknowledge, however, that his evaluation results did not

warrant residential placement (T. 1295).in larger settings of 20-30 students (T.

1284) to help her monitor and organize assignments.  He did not specifically

As of August 2007, B's scores in core language skills ranged from average

to bright-normal.  B's scores, as reflected in the August 2007 administration of the

CELF-4, were as follows: Core Language (100); Receptive Language (115);

Expressive Language (99); Language Content (125); Language Memory (108)

(District Ex. 18, p. 11).

B's results on the SCAN-A administered by Dr. Geffner differed noticeably

from that administered by Dr. Davidovicz.  (Compare District Ex. 17 with District

Ex. 18).  Further, B's performance on the auditory components of the CELF-4 (e.g.

understanding spoken paragraphs (95%) and semantic relationships (91%)),

demonstrate that B compensates for whatever lower order auditory processing

weaknesses she may have, and that she has no higher order auditory processing

deficits (T. 1135).  Dr. Geffner's results and interpretations must be viewed with

skepticism.  The scores fail to show that B has a language disability (T. 89, 216).

Dr. Geffner abandoned the role of a professional evaluator, instead acting as an

advocate (T. 944)

Dr. Geffner's summary and recommendations (District Ex. 18, pp. 7-9) are

at odds with Dr. Geffner's evaluation results as well as Dr. Davidovicz's

10

evaluation.  For example, Dr. Geffner refers to B's reading disorder, but B's oral reading scores fell in the average range, and her scores on the Woodcock Reading Mastery evaluation were in the bright-normal range.  B's receptive language ability is above average, making it difficult to fathom how any auditory processing weakness continues to impact B academically (<u>Compare</u> District Ex. 17 to District Ex. 18).  B's scores on the auditory subtests of the CELF were also quite high, demonstrating that B displays no higher order auditory processing deficits, as attested by Dr. Willis (T. 1135).  Dr. Davidovicz did not believe B to have any speech-language needs (T. 1294).

Furthermore, B's testimony at the impartial hearing was poised and articulate.  In a regular-sized, non-carpeted classroom with about 10 people present, and with the background noise of court-reporting equipment and a laptop computer, B was able to hear and understand the questions posed to her on direct and cross examination and respond to them fully (T. 1163-1197).  In short, without the use of any assistive technology, B exhibited no residual auditory processing deficits during her testimony and demonstrated strong oral receptive and expressive language skills.[2]

---

[2] Behavior at hearing may be considered as evidence.  <u>Escambia County Bd. of Educ. v. Benton</u>, 406 F.Supp.2d 1248, (S.D.Ala. 2005) (IHO's observations of non-verbal behavior of autistic student at hearing incorporated into factual findings did not constitute inappropriate consideration of extra-record material).

Testing done by Landmark during B's 7th grade year also demonstrated B's strong skills.  On the Woodcock Reading Mastery Test, conducted in May 2007, B's scores were average to above average.  Her oral reading skills were all within the average range.  Finally, in areas of reading, listening and math, evaluated in April 2007, B's scores were all average to above average, falling between the 50th and 85th percentile (District Ex. 11, p. 3).

Generally, testing reveals that B has developed skills that compensate for her deficits.  This is clearly demonstrated by B's ability to essay starring roles in school productions, both in Southold and at Landmark.  B has been able to memorize lengthy portions of dialogue and perform them with skill (T. 1181-1182), compensating admirably for her working memory weakness, and demonstrating that she is able to function well in typical settings when she desires to do so.  Testing also lends further support to the fact that B does not require a full-time special education program to meet her needs.

### Landmark

B was unilaterally placed at Landmark by her Parent commencing in the 2006-07 school year.  She attended Landmark in 2007-08 and 2008-09 as a residential student.  Landmark exclusively serves students with language-based learning disabilities (T. 563, 579).  Hence, at Landmark, B has no opportunity to learn alongside her typically developing peers (T. 719).

12

B's classes consist of six to eight students, all of whom exhibit language-based disabilities.  There are 300 students enrolled at the high school campus (about 60 students in the preparatory program in which B was enrolled in 2008-09), about half of whom were placed at Landmark by their home school districts (T. 580, 720).  Mainstreaming students is not one of Landmark's goals (T. 609-610).  As Landmark is located in Massachusetts, B is isolated from her home community.  It takes B several hours by bus plus a ferry trip to return home (T. 882).

B's brother, K, was accepted to Landmark in February or March of 2006; Parent knew as of then that her son would be attending Landmark (T. 1255-1256), making Landmark a convenient, if inappropriate, educational environment for B.

<u>2007-08</u>

In 8th grade, B took language arts, math, reading, science, US history I, tutorial and chorus (T. 678).  The tutorial worked on decoding and comprehension, writing and study skills (T. 691).  The techniques used in the tutorial would be familiar to any reading teacher (T. 735, 739).  B attended the high school in 8th grade because she was boarding, and attended classes with both 8th and 9th grade students (T. 769-780).  The program manages and makes completely predictable every waking hour of the student's day, including scheduled after school activities, room cleaning, and staff-monitored study hall at night (T. 689-690).   Karl

13

Pulkinnen, Landmark's Public School Liaison, recommended an extended school day for B to provide direct instruction for doing independent work (T. 798). The concept that independent work could require direct instruction typifies Landmark's overly intensive (for B) and thereby inappropriate program. Students are provided assignment notebooks, which are checked by both the tutorial teacher and dorm staff to ensure that assignments are written down and completed nightly (T. 707-708). By contrast, in Southold, the regular and special education teacher remind students to write down their assignments at the beginning of every period; assignments are written both in the regular education classroom and the inclusion teacher's classroom (T. 1247). The case manager admitted that most school systems provide students with assignment notebooks (T. 738). B's language arts class in 8th grade was considered a freshman class (T. 751). The books utilized in the class were on about a 5th grade reading level (T. 775). The teacher found B to be a very conscientious student who kept her work very organized (T. 769). B did not exhibit any attentional issues and was well-organized (T. 753-754, 758).

Her case manager for that year said B had a language-based learning disability, although he admitted that she scored well above average in the TOWL and that her CELF-4 scores were all 99 or higher (T. 725-727). He noted that B's performance in "Arsenic and Old Lace" was great, and that she had no difficulty handling the large amount of dialogue (T. 741). He also admitted that B has no

14

behavioral issues that impact her ability to learn (T. 733).

2008-09

In 2008-09, B's 9th grade year, B took physical science, study skills, US history II, geometry, literature, and grammar and composition, and chorus and drama in the preparatory program (T. 558). The schedule included daily mandatory activities in the afternoon as well as structured study hall for 1 ½ hours every evening (T. 583-584). The difference between the preparatory and the standard program was that the preparatory program did not include a 1:1 reading tutorial, as it was decided that B no longer required it (T. 589-590, 613, 657).

In science, the students were provided templates for writing lab reports (T. 596). Use of templates is not unique; they are regularly used in Southold (T. 154). At Landmark, B was taking the 2nd year of U.S. history in a class of five students (T. 525-526). The class was described as being for sophomores (T. 528, 546), although the text was described as being harder than a 5th grade level (T. 558). Her teacher could not say how B was doing vis-à-vis her classmates and was unaware of her cognitive ability (T. 544).

B's 9th grade language and composition teacher described the writing process utilized with the six students in B's class; they wrote an essay regarding a novel, and worked on vocabulary either from the novel or a SAT vocabulary list (T. 663). None of these instructional techniques are unique to Landmark. For

15

example, in Southold, students start a vocabulary book at the beginning of the year, and use multimodal strategies to learn the words (T. 1251).  The writing process in Southold includes a brainstorming activity with classroom discussion; use of the SMART board to develop a theme; use of a graphic organizer that is then developed into a template for drafting an essay that includes an introduction, body paragraphs, and a conclusion (T. 1253).  Just as at Landmark (T. 527), Southold students develop sample test questions for purposes of test preparation (T. 1248). Two column note-taking was used in Landmark social studies class (T. 529-530) and in Southold in English (T. 1249-1250).

B's case manager did not know why B started in the high school program as an 8th grader (T. 605).  She also did not know if B's writing needs were any different from those of her non-disabled peers, was unfamiliar with the books B had read, seemed unfamiliar with Massachusetts' mathematics curriculum, and was unaware of B's plans post-high school (T. 625, 635, 643, 649-650).

Neither B's 8th or 9th grade case managers at Landmark believed that B required residential placement in order to make progress (T. 641, 729).  She exhibited no behavioral or management needs that required a residential setting (T. 812).

B is a student who was indistinguishable from her non-disabled peers, capable of flourishing in the mainstream environment as demonstrated by her

ability to memorize lengthy monologues for the Southold musical "Bye Bye Birdie" and perform her roles in Landmark plays with confidence and poise. This is a hallmark of the IDEA, to educate students in the least restrictive environment in which they can make progress.

## Summary of Argument

The decision of the District Court should be affirmed in all respects. The District conceded from the outset that it did not offer B a FAPE for the 2008-09 school year as a result of a procedural technicality of developing the IEP for that school year. The concession does not imply that B could not be successful in a mainstream public school setting. However, Parent did not sustain her burden to establish the appropriateness of B's unilateral placement at Landmark for the 2008-09 school year.

A board of education may be required to pay for educational services obtained for a child by the child's parents, if the services offered by the board of education were inadequate or inappropriate, *the services selected by the parents were appropriate*, and equitable considerations support the parent's claim. Burlington, 471 U.S. at 369; Carter, 510 U.S. at 12 (emphasis added). This standard has been articulated as the prongs of the Burlington test.

Parents who seek reimbursement bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate. M.S. v. Bd.

17

of Educ. of the City of Yonkers, 231 F.3d 96, 104 (2d Cir. 2000), cert. den. 532 U.S. 942, 121 S.Ct. 1403 (2001); See N.Y. Educ. Law § 4404(1)(c).  The parents' placement must be "reasonably calculated to enable the child to receive educational benefits," such that it is "likely to produce progress, not regression". Frank G. v. Bd. of Educ., 459 F.3d 356, 364 (2d Cir. 2006) (internal quotation marks omitted).

While a court may consider a student's progress in a private placement setting, the Second Circuit has clearly established that the attention must remain on whether the placement satisfies the student's unique needs.  "Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit," Id., but "academic success at the private placement alone is not sufficient."  E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist., 742 F.Supp.2d 417, 444 (S.D.N.Y. 2010).  Therefore, while "a child's progress is relevant to the court's review, such progress does not itself demonstrate that a private placement was appropriate."  Weaver v. Millbrook Cent. Sch. Dist., 812 F.Supp.2d 514, 523 (S.D.N.Y. 2011) (internal quotation marks omitted).  Parents must show that the placement "provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction."  Frank G., 459 F.3d at 365 (internal quotation marks omitted).  The IDEA also demonstrates a "strong preference for

18

'mainstreaming,' or educating children with disabilities 'to the maximum extent appropriate' alongside their non-disabled peers." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003) (alteration in original) (quoting 20 U.S.C. § 1412(a)(5)). However, "the standard applied to … parental placements is less restrictive and subject to fewer constraints than that applied to school authorities." Weaver, 812 F.Supp.2d at 523. "Nonetheless, IDEA's requirement that an appropriate education be in the mainstream to the extent possible remains a consideration that bears upon a parent's choice of an alternative placement and *may be considered* by the hearing officer in determining whether the placement was appropriate …" M.S., 231 F.3d at 105 (reversing district court's tuition award to parents where SRO denied tuition on grounds that the private placement was too restrictive) (emphasis added). Therefore, least restrictive environment is a factor which may be considered to determine appropriateness of placement.

It is submitted that the Parent's unilateral placement of B as a residential student at a private special education facility that is hundreds of miles from her home and community, with no opportunity for mainstreaming, is inappropriate to meet her needs and is so overly restrictive as to be inappropriate for that reason alone. The District Court correctly upheld the administrative level decisions of the IHO and SRO who used well-established legal precedent in their analysis and review of Parent's entitlement to tuition reimbursement for the 2008-09 school

year. Parent simply failed to meet her burden – as she does here on appeal. Therefore, the District respectfully submits that this Court affirm the decision of the District Court to deny Parent tuition reimbursement for the 2008-09 school year.

## **Argument**

## **POINT I**

## **STANDARD OF REVIEW**

Federal Courts have a defined role in their review of state educational decisions under the IDEA. Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007). Federal Courts reviewing administrative determinations under the IDEA must base their decisions on a preponderance of the evidence, taking into account not only the record from the administrative proceedings, but any additional evidence presented to the Court by the parties. 20 U.S.C. § 1415(c)(2). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998) (quoting Rowley, 458 U.S. at 206, 208, (internal quotation marks and citation omitted)). The *de novo* review of the District Court's holding is generally limited, requiring "substantial deference to

20

state administrative bodies on matters of educational policy." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005).

Although Federal Courts engage in an independent review of the administrative record and make a determination based upon a preponderance of the evidence, they should not substitute their ideas of sound educational policies for those of the school authorities they review. Rowley, 458 U.S. at 206. Thus, where an SRO decision "is reasoned and supported by the record," the District Court should not disturb it. Gagliardo, 489 F.3d at 114. Deference to the SRO is "particularly appropriate when the administrative officer's review has been thorough and careful, and when the Court's decision is based solely on the administrative record" that was before the SRO. Jennifer D. v. N.Y. City Dep't of Educ., 550 F. Supp.2d 420, 429 (S.D.N.Y. 2008).

In this case, in a well-reasoned, exhaustive decision, the IHO thoroughly addressed, analyzed and made findings concerning each allegation set forth in the Parent's impartial hearing request, including Parent's claim that Landmark was an appropriate placement. That record was independently and carefully reviewed by the SRO. The SRO determined that the IHO "accurately recounted the facts of the case, and he set forth the proper legal standard to determine … whether the parents sustained their burden to establish the appropriateness of [B's] unilateral placement at Landmark for the 2008-09 school year" (JA 62). The IHO's findings of fact and

21

conclusions of law were adopted; the SRO affirmed that Parent was not entitled to reimbursement for tuition costs for the 2008-09 school year because Landmark was "overly restrictive for [B] and otherwise inappropriate" (JA 65; 28).  The District Court gave proper deference to the state authorities finding that the SRO's conclusion was supported by a preponderance of the evidence and affirmed the decision (JA 107).  It is respectfully submitted that this Court afford proper deference to this decision as well.

## POINT II

### THE DISTRICT COURT CORRECTLY UPHELD THE DENIAL OF TUITION REIMBURSEMENT FOR THE 2008-09 SCHOOL YEAR AS THE UNILATERAL PLACEMENT AT LANDMARK WAS INAPPROPRIATE TO MEET B'S EDUCATIONAL NEEDS

Despite the fact that the District admittedly did not finalize an IEP for the 2008-09 school year, it still does not follow that Landmark was appropriate. A board of education may only be required to pay for educational services obtained for a child by the child's parents where (a) the services offered by the board of education were inadequate or inappropriate; (b) the services selected by the parents were appropriate under the Act; and (c) where equitable considerations support the parents' claim for tuition reimbursement.  Burlington, 471 U.S. at 369; Carter, 510 U.S. at 12.  The law remains that courts may only grant tuition reimbursement when a school district fails to provide a FAPE *and* the private school placement is

22

appropriate.  Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 242 n. 9 (2009).   A

student's parents bear the burden of proof regarding the appropriateness of the

educational program for which he or she seeks reimbursement.  M.S., 231 F.3d at

104; Application of a Student with a Disability, Appeal No. 09-018; Education

Law § 4404(1)(c).   Parent did not satisfy this second prong of the

Burlington/Carter test in that the record clearly demonstrates that Landmark was

not an appropriate educational placement for B.

     "A unilateral private placement is only appropriate if it provides education

instruction *specifically* designed to meet the *unique* needs of a handicapped child."

Gagliardo, 489 F.3d at 115 (internal quotation and citation omitted).  Progress in

the private placement does not in and of itself demonstrate that the unilateral

placement is appropriate, particularly where the "chief benefits of the chosen

school are the kind of educational and environmental advantages and amenities

that might be preferred by the parents of any child."  Id.  Private schooling may be

"the ideal educational setting to maximize the potential of many children.  The

IDEA, however, does not require a school district to pay for a private school

education simply because that opportunity would be ideal for the student."  A.E. v.

Westport Bd. of Educ., 463 F.Supp.2d 208, 221 (D. Ct. 2006).  Parents cannot seek

any alternative school they wish if the public school education is inadequate.

Rafferty v. Cranston Public Sch. Comm., 315 F.3d 21, 27 (1st Cir. 2002).

23

Furthermore, federal courts must employ the same objective evidence standard in their review of a unilateral parental placement as they do with regard to a school district placement, remaining ever-mindful of the deference due to administrative decisions based upon the administrative record.  Frank G., 459 F.3d at 364, 367.

The IHO found that Landmark was overly restrictive and otherwise inappropriate for B (JA 59).  The SRO adopted the IHO's findings (JA 65).  The District Court affirmed the SRO's decision (JA 107).  The basis for the IHO's decision was not that Landmark was not B's least restrictive environment.  The difference is a critical one.[3]

While parents are not held as strictly to the standard of placement in the least restrictive environment as school districts are, the question remains a relevant factor in determining whether a parent is entitled to an award of tuition reimbursement.  Rafferty, 315 F.3d at 26-27; M.S., 231 F.3d at 96.  Decisions within courts of the Second Circuit often and consistently reflect consideration of the restrictiveness of a parental placement in determining that such placement was not appropriate.   See, e.g. Schreiber v. East Ramapo Cent. Sch. Dist., 700 F.Supp.2d 529 (S.D.N.Y. 2010) (finding that a "private placement can be

---

[3] Pursuant to the Regulations of the Commissioner of Education, the placement of an individual student with a disability in the least restrictive environment shall: (1) provide the special education needed by the student; (2) provide for education of the student to the maximum extent appropriate to the needs of the student with other students who do not have disabilities; and (3) be as close as possible to the student's home.  8 NYCRR § 200.1(cc).  See 34 C.F.R. §300.114(a)(2), 300.116.

appropriately rejected when there is no indication that the placement would eventually transition the student into a less restrictive placement); <u>Pinn v. Harrison Cent. Sch. Dist.</u>, 473 F.Supp.2d 477, 482 (S.D.N.Y. 2007) (finding that SRO did not err in concluding that private placement was inappropriate considering, inter alia, that the student did not have the opportunity to take mainstream classes).

Other jurisdictions consider this factor as well. <u>Ashland Sch. Dist. v. Parents of Student R.J.</u>, 588 F.3d 1004 (9th Cir. 2009) (where residential placement was not required for any educational reason, tuition reimbursement was not warranted); <u>M.S. v. Fairfax County Sch. Bd.</u>, 553 F.3d 315 (4th Cir. 2009) (consideration of restrictiveness of parental placement as a factor in its appropriateness was proper under IDEA); <u>W.C. v. Cobb County Sch. Dist.</u>, 407 F.Supp.2d 1351, 1362-63 (N.D.Ga. 2005) (mainstreaming is proper consideration in determining whether parental placement is appropriate); <u>Kasenia R. v. Brookline Sch. Dist.</u>, 588 F.Supp.2d 175, 193-194 (D.NH 2008) (even if proposed IEP was inadequate, parents not entitled to reimbursement because unilateral placement was not least restrictive environment).

Federal and state law require that students with disabilities be educated in the least restrictive environment. The IDEA demonstrates a "strong preference for 'mainstreaming,' or educating children with disabilities 'to the maximum extent appropriate' alongside their non-disabled peers." <u>Grim</u>, 346 F.3d at 379 (alteration

in original) (quoting 20 U.S.C. § 1412(a)(5)).  Separate schooling may occur only when it is determined that the child <u>cannot</u> be educated satisfactorily in that environment, even with the use of supplementary aides and services.  <u>See</u> 20 U.S.C. §1412(a)(5)(A).[4]

Testimony adduced at the hearing demonstrates that Landmark is not an appropriate educational placement for B as it is far too restrictive, depriving her of the benefits of a mainstream environment.  Since B demonstrated her ability to be educated in a mainstream environment with resource room services via the progress she made during prior years in the District, an appropriate program for B should include her education in a mainstream environment alongside non-disabled students, with special education supports.  At Landmark, B is in a totally segregated residential environment, with very limited opportunity to model the behavior of and socialize with her non-disabled peers.  She went from nearly the least restrictive setting possible in Southold – mainstream with resource room – to the opposite end of the spectrum – a residential private placement at a school that

---

[4] Pursuant to the Regulations of the Commissioner of Education, *Least restrictive environment* means that placement of students with disabilities in special classes, separate schools or other removal from the regular educational environment occurs only when the nature or severity of the disability is such that even with the use of supplementary aids and services, education cannot be satisfactorily achieved. The placement of an individual student with a disability in the least restrictive environment shall:  (1) provide the special education needed by the student; (2) provide for education of the student to the maximum extent appropriate to the needs of the student with other students who do not have disabilities; and (3) be as close as possible to the student's home.  8 NYCRR §200.1(cc)

26

services only disabled students that is hours from her home environment. It is unfathomable that a student who was making appropriate progress within the context of a mainstream program could be appropriately placed at a private residential special education school several hundred miles from home and two or three states removed. As one court has recently opined, B "is exactly the sort of student for whom IDEA mandates education in the public setting – and for whom extensive or premature consideration of schooling in an exclusively disabled student environment … would be inappropriate as a matter of law." W.S. *ex rel.* C.S. v. Rye City Sch. Dist., 454 F.Supp.2d 134, 149 (S.D.N.Y. 2006) (CSE correctly did not err by failing to consider more restrictive placement for child who could benefit from being educated in public school setting).

Furthermore, a residential placement is one of the most restrictive educational placements available for a student and it is well settled in this Court that a residential placement is not appropriate unless it is *required for a student to benefit from his or her educational program.* Walczak, 142 F.3d at 122; Mrs. B. v. Milford Bd. of Educ., 103 F.3d 114, 1121-22 (2d Cir. 1997) (emphasis added). Arguably, given B's academic abilities, she did not require a residential setting to receive educational benefits and she is capable of making progress in other programs.

Landmark services about 300 students, all with language-based learning

27

disabilities, in its high school program (60 in the preparatory program in which B is enrolled), using small carpeted classrooms with six to eight students (T. 579, 580, 720).  Instruction at Landmark is more restrictive than is appropriate.  B is losing out on being in close proximity to her home and peers (T. 312).  Moreover, placement in this segregated setting is likely to hamper B by leading her to believe that she is not capable of learning in a traditional school setting, and may impact her ability to succeed in college (Id.; see T. 155, 214).  At Landmark, during academic instruction and study hall time, B.D-S. has no access to typically developing peers, yet such access is critical to her development (T. 310).  It would do B. a tremendous disservice to find, following her success in the mainstream, that she is appropriately placed in such an environment. The IHO correctly found the special education residential placement particularly troubling in light of B's academic capabilities (JA 28).

Two proceedings before the SRO bear striking similarity to the facts presented here.  In both Application of a Student with a Disability, Appeal No 08-151, and Application of a Student with a Disability, Appeal No. 09-018, the *school district conceded that it had not offered FAPE*.  In the former case, the SRO affirmed the IHO's decision that the parental placement was not appropriate on the grounds that the student had not demonstrably made progress and the placement was more restrictive than necessary.  Even more instructive is the latter

28

proceeding.  In this matter, the student, classified OHI, had very high verbal and

perceptual reasoning skills, but average or lower memory skills.  His academic

skills were generally strong.  He was parentally placed at Landmark's residential

high school program.  The evidence regarding Landmark's program was nearly

identical to that presented here with regard to the very structured program, the

required after-school activities, and the level system used in the dorms.  The

student's case manager testified as follows:

> Landmark is designed for students to be residents.
> Although some students are day students, the ones who
> are residents benefit the most.  And the reason being that
> every minute of their day, from the minute they wake up
> to the minute they go to sleep, is structured and designed.
> They do not have to make any decisions.  Appeal No. 09-
> 018, p. 13

Compare this to the testimony of B's eighth grade case manager:

> The entire program is truly designed around residential
> student[s] in so far as we manage their lives from the
> minute they wake up to the minute they go to sleep. …
> That structure provides her boundaries that she works in.
> There's a huge amount of predictability of what's going
> to happen in her life each day.  She doesn't have to worry
> about – when am I going to do homework.  We are
> telling B for a certain time every night she will be in her
> room and the expectation is that she's doing her work. …
> (T. 689-690).

The claim that Landmark helps students be more independent (T. 532-534)

is simply untrue.  To prepare the students for the larger classroom environment in

college, "We would prepare them by suggesting that they sit in the front of the class" (T. 714). Even Landmark's professional staff acknowledged that B does not need a residential placement to make progress (See T. 641, 729) and one teacher noted that B.D-S. "is a very conscientious student and kept her work very organized" (T. 769).

Accordingly, the record herein "is insufficient to show that this intense level of programming is required in order to meet the student's special education needs." Appeal No. 09-018, p. 13. Moreover, just as in that appeal, "the record lacks sufficient evidence to support that the student required a residential program at Landmark in order to meet [her] special education needs." Id. The SRO previously determined, and the District Court upheld, that the 7th grade Landmark placement was overly restrictive in that B did not require a full day special education placement. Application of a Student with a Disability, Appeal No. 07-119, p.14; Dzugas-Smith v. Southold Union Free Sch. Dist., No. 08-CV-1319(SJF) 2012 WL 1655540, 26 (E.D.N.Y. May 9, 2012). The residential placement is even more inappropriate.

"It seems rather basic … that minimally parental placements should be calculated to provide some element of programming that they assert the district's proposal to be deficient in." Owen J. Roberts School District, 29 IDELR 742 (SEA Pa. 1998). The Parent has failed to show that Landmark offered any special

30

education techniques or learning strategies or any related services specifically geared to B's unique needs, particularly given the restrictive nature of the program – rather, it offered the same approach for all students.  Moreover, it offered no unique program at all - Southold utilized techniques similar to Landmark's.

Parent argues that *Weaver* applies the *Newington* test of least restrictive environment to determining the overall appropriateness of parental placements and alleges that the requirements of that test are unworkable as it pertains to parental placements (Plaintiff-Appellant Brief, p. 17); P v. Newington Bd. Of Ed., 546 F.3d 111 (2d Cir. 2008).  However, the District argues that Parent misinterprets *Weaver* as *Weaver* merely re-affirms that parents are not strictly held to the same standard as public schools with regard to placement in the least restrictive environment. Weaver, 812 F.Supp.2d at 523-24 ("the standard applied to … parental placements is less restrictive and subject to fewer constraints than that applied to the school authorities.")  Parent also argues that 3rd, 6th and 8th Circuit cases hold that "a private placement need not satisfy a least-restrictive environment requirement to be 'proper' under the Act" (Plaintiff-Appellant Brief, p. 18).  However, the District asserts that these Circuits still hold that the second criterion of the Burlington/Carter analysis must be met (i.e. the appropriateness of the private placement) and merely re-state what was addressed in *Weaver* - that parents seeking an alternative placement may not be subject to the same mainstreaming

31

requirements as public schools.  Appropriateness of the parental placement still remains a requirement.  In this case, legal standards and analysis were based on well-established law as provided in 2nd Circuit courts – the courts which establish the controlling legal precedent here.  There was no mistake of law in the determination that the parental placement was inappropriate in that it was overly restrictive to meet B's educational needs.  In addition, it is respectfully asserted that the decisions of the 3rd, 6th and 8th Circuits reflected above are inconsistent with determinations made in this Circuit as set forth herein to the extent that they hold that the least restrictive environment requirement is not a factor in determining appropriateness.

As was amply supported by the record, the determination that Landmark was overly restrictive and otherwise inappropriate to meet B's educational needs warranted a denial of tuition reimbursement for the 2008-09 school year and should be affirmed.

## **Conclusion**

For the foregoing reasons, the District respectfully submits that the decision of the District Court should be affirmed in all respects.

Dated: Hauppauge, New York
     June 22, 2012

                    Respectfully submitted,

                    INGERMAN SMITH, L.L.P.

                    s/ Christopher F. Venator
                    _____
                    By: CHRISTOPHER F. VENATOR
                    Attorneys for the Defendant-Appellee
                    SOUTHOLD UNION FREE SCHOOL
                    DISTRICT
                    150 Motor Parkway, Suite 400
                    Hauppauge, New York 111788
                    (631) 261-8834

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
-----------------------------------------------------X
D. D-S., Individually and as a Parent and Next
Friend to B. D-S., a Child with a Disability,

                  Plaintiff-Appellant,      **CERTIFICATE OF COMPLIANCE**

        -vs.-

                                    Docket No.
SOUTHOLD UNION FREE SCHOOL     11-4697-CV
DISTRICT,

                  Defendant-Appellee.
-----------------------------------------------------X

      CHRISTOPHER F. VENATOR, an attorney duly admitted to practice

before this Court, hereby certifies, as follows:

    1.    This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 7,542 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

    2.    This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of 32(a)(6) of the Federal Rules of Appellate Procedure because the brief has been prepared in a proportional typeface using Microsoft Word with 14 characters per inch in Times New Roman typeface, size 14 point.

Dated:     Hauppauge, New York
          June 22, 2012

                       s/ Christopher F. Venator
                       CHRISTOPHER F. VENATOR